# CV 16    2312

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

JAMES G. PAULSEN, Regional Director of
Region 29 of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD

**AMON, J.**

Petitioner

**GOLD, M.J.**  CV-

v.

COMMUNICATIONS WORKERS OF AMERICA

Respondent

## PETITION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO § 10(l) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

To the Honorable Judges of the United States District Court for the Eastern District of New York:

**COMES NOW** James G. Paulsen, Regional Director for Region 29 of the National Labor Relations Board (the "Board"), and petitions this Court for and on behalf of the Board, pursuant to § 10(l) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. § 160(l) (the "Act"), for a temporary restraining order pursuant to Fed. R. Civ. P. 65(b) pending the final disposition of the matters herein involved now pending before the Board on charges alleging that Communications Workers of America ("Respondent") has engaged in, and is engaging in, acts and conduct in violation of §§ 8(b)(4)(i) and (ii)(B) of the Act, 29 U.S.C. §§ 158(b)(4)(i) and (ii)(B). In support of this petition, Petitioner respectfully shows as follows:

1.     Petitioner is the Regional Director of the Twenty Ninth Region of the Board, an agency of the United States, and files this Petition for and on behalf of the Board.

1

2.      Jurisdiction of this Court is invoked pursuant to §10(l) of the Act, 29 U.S.C. §

160(l), which provides that the Board shall have power, upon issuance of a Complaint charging

that any person has engaged in or is engaging in an unfair labor practice, to petition any United

States district court, within any district wherein the unfair labor practice in question is alleged to

have occurred or wherein such person resides or transacts business, for appropriate temporary

relief or restraining order.

3.      (a)     On May 2, 2016, Verizon New York Inc., Verizon Corporate Service

Corp., Verizon Services Corp. and Empire City Subway Company (Limited) (collectively,

"Verizon") filed a charge with the Board in Case No. 29-CC-175331 alleging that Respondent

violated § 8(b)(4)(ii)(B) of the Act. A copy was served on Respondent by U.S. mail on May 3,

2016.

(b)     The Amended Charge in Case No. 29-CC-175331 alleging that

Respondent violated §§ 8(b)(4)(i) and (ii)(B) of the Act was filed on May 5, 2016, and a copy

was served on Respondent by U.S. mail on May 6, 2016.

4.      The aforesaid charge was referred to Petitioner as Regional Director of Region 29

of the Board.

5.      Following a review of the field investigation during which all parties had an

opportunity to submit evidence, the Petitioner determined that there is reasonable cause to

believe, as alleged in the amended charge in Case 29-CC-175331, that Respondent was engaging

in unfair labor practices in violation of §§ 8(b)(4)(i) and (ii)(B) of the Act.

6.      On May 6, 2016, Petitioner, upon the aforesaid charge and pursuant to § 10(b) of

the Act, issued a Complaint and Notice of Hearing alleging that Respondent has been engaging

in unfair labor practices within the meaning of §§ 8(b)(4)(i) and (ii)(B) of the Act. A hearing on

the allegations of the Complaint is scheduled to be held before an Administrative Law Judge of the Board on June 9, 2016.

7.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, true copies of the charge and service thereof in Case 29-CC-175331, the Complaint, supporting affidavits and documents are attached and marked as Petitioner Exhibit 1-15 and incorporated as though fully set forth.

8.     Petitioner avers that there is a likelihood that the allegations set forth in the Complaint are true and that Respondent has engaged in, and is engaging in, unfair labor practices in violation of §§ 8(b)(4)(i) and (ii)(B) of the Act for which a remedy will be ordered by the Board, but that the need for immediate injunctive relief exists due to Respondent's egregious conduct and the Board's order remedying the unfair labor practice conduct will be frustrated without the temporary restraining order sought herein. In support thereof, and of the request for a temporary restraining order, Petitioner, upon information and belief, shows as follows:

(a)     At all material times, Verizon has been a domestic corporation with an office and place of business located at 140 West Street, New York, New York, and with various offices and facilities located throughout the State of New York and vicinity, and is engaged in the business of providing telecommunications services.

(b)     In conducting its operations annually, Verizon derives gross revenues in excess of $1,000,000, and purchases and receives at its various New York facilities goods and services valued in excess of $50,000 directly from points located outside the State of New York.

(c)     At all material times, Verizon has been an Employer engaged in commerce within the meaning of §§ 2(2), (6), and (7) of the Act.

(d)     At all material times, Respondent has been a labor organization within the meaning of § 2(5) of the Act.

(e)     At all material times, the following individuals have held the positions set forth opposite their names and have been agents of Respondent within the meaning of § 2(13) of the Act:

-Tony Spina - President of CWA Local 1109

-John Joseph ("Val") Valentino - Business representative of CWA Local 1101

-Alphonse Russo - Vice-president of CWA Local 11018.

(f)     At all material times, Respondent has been engaged in a labor dispute with Verizon.

(g)     At no material time has Respondent been engaged in a labor dispute with the following entities:

-Fairfield Inn & Suites New York Brooklyn located at 181 3rd Avenue, Brooklyn, New York.

-Courtyard New York Manhattan/Times Square located at 114 West 40th Street, New York, New York.

-Hampton Inn Garden City located at One North Avenue, Garden City, New York.

-Hilton New York JFK Airport located at 144-02 135th Avenue, Queens, New York.

-Residence Inn New York The Bronx located at 1776 Eastchester Road, Bronx, New York.

-Grand Hyatt New York located at 109 East 42nd Street, New York, New York.

(h)     About April 15, 2016, Respondent, at the Courtyard New York Manhattan/Times Square, by individuals aligned with Respondent whose identities are currently

4

unknown, picketed and appealed to employees of the Courtyard New York Manhattan/Times Square to cease lodging employees of Verizon, in support of its dispute with Verizon described above in paragraph 8(f).

    (i)  About April 25, 2016, in support of its dispute with Verizon described above in paragraph 8(f), Respondent, by Valentino and Russo at the Grand Hyatt New York lobby, threatened to picket the hotel the following day.

    (j)  About April 26, 2016, Respondent, at the Grand Hyatt New York, by Valentino, Russo and other individuals aligned with Respondent whose identities are currently unknown, picketed and appealed to employees of the Grand Hyatt New York to cease lodging employees of Verizon in support of its dispute with Verizon described above in paragraph 8(f).

    (k)  About April 25, 2016, Respondent, at the Fairfield Inn & Suites New York Brooklyn, by Tony Spina and other individuals aligned with Respondent whose identities are currently unknown, picketed and appealed to employees of the Fairfield Inn to cease lodging employees of Verizon in support of its dispute with Verizon described above in paragraph 8(f).

    (l)  About April 26, 2016, Respondent, at the Residence Inn New York The Bronx, by individuals aligned with Respondent, whose identities are currently unknown, picketed and appealed to employees of the Residence Inn to cease lodging employees of Verizon, in support of its dispute with Verizon described above in paragraph 8(f).

    (m)  About April 28, 2016, Respondent, at the Hampton Inn Garden City, by individuals aligned with Respondent whose identities are currently unknown:

      (i)  picketed and appealed to employees of Sysco to not deliver bottled water to the Hampton Inn in support of its dispute with Verizon described above in paragraph 8(f); and

(ii)     picketed and appealed to employees to cease lodging employees of Verizon in support of its dispute with Verizon described above in paragraph 8(f).

(n)     About April 29 through May 2, 2016, Respondent, at the Hilton New York JFK Airport, by individuals aligned with Respondent whose identities are currently unknown, picketed and appealed to employees of the Hilton Hotel to cease lodging employees of Verizon in support of its dispute with Verizon described above in paragraph 8(f).

(o)     By the conduct set forth above in paragraphs 8(h) through 8(n), Respondent has induced or encouraged individuals employed by Fairfield Inn & Suites, Courtyard New York/Times Square, Hampton Inn Garden City, Hilton New York JFK Airport, Residence Inn New York The Bronx, and Grand Hyatt New York and other persons engaged in commerce or in industries affecting commerce to refuse to handle goods or perform services, and has threatened, coerced, or restrained Fairfield Inn & Suites, Courtyard New York/Times Square, Hampton Inn Garden City, Hilton New York JFK Airport, Residence Inn New York The Bronx, and Grand Hyatt New York and other persons engaged in commerce or in industries affecting commerce.

(p)     An object of Respondent's conduct described above in paragraphs 8(h) through 8(n) has been in part to force or require Fairfield Inn & Suites, Courtyard New York/Times Square, Hampton Inn Garden City, Hilton New York JFK Airport, Residence Inn New York The Bronx, and Grand Hyatt New York and other persons to cease doing business with Verizon.

(q)     An object of Respondent's conduct described above in paragraph 8(m) has been in part to force or require Sysco and other persons to cease handling or otherwise dealing in the products of, and to cease doing business with Hampton Inn Garden City, and other persons,

6

in order to force or require Hampton Inn Garden City to cease handling or otherwise dealing in the products of, and to cease doing business with Verizon.

(r)     By the conduct described above in paragraphs 8(h) through 8(q) Respondent has been violating §§ 8(b)(4)(i) and (ii)(B) of the Act.

(s)     The unfair labor practices of Respondent described above affect commerce within the meaning of §§ 2(6) and (7) of the Act.

(t)     The acts and conduct of Respondent described above in paragraphs 8(h) through 8(s) have taken place in part within this judicial district.

9.     (a)     Absent immediate injunctive relief, Respondent's actions threaten to inflict irreparable harm on Verizon's business operations and impede the free flow of commerce.

(b)     The threat of further unlawful conduct from Respondent is tangible, as the labor dispute is ongoing, and there are allegations of continuing picketing and threats. This illegal campaign may force Verizon to capitulate to Respondent's demands in the primary labor dispute. The Board's final order will not effectively remedy these harms.

(c)     Respondent's actions also threaten the neutral parties by impeding their ability to participate in interstate commerce and disrupting the hotels' essential services and enmeshing the neutral businesses in the primary labor dispute by forcing them to take sides on the dispute between Respondent and Verizon.

10.     Unless a temporary restraining order is immediately obtained, it can fairly be anticipated that Respondent will continue to repeat the acts and conduct set forth above in paragraph 8 or similar or like acts and conduct violative of §§ 8(b)(4)(i) and (ii)(B) of the Act. It is, therefore, essential, appropriate, just and proper, for purposes of effectuating the policies of the Act and in accordance with the provisions of § 10(l), that pending final disposition of the

7

matter herein involved now pending before the Board, Respondent be enjoined and restrained from the commission of the acts and conduct alleged above, and similar acts and conduct, or repetitions thereof.

11.     Upon information and belief, as more fully appears from the affidavits and documents attached hereto and made a part hereof, there is imminent danger that, before a hearing can be held on this Petition, immediate, substantial and irreparable injury will unavoidably result to the policies of the Act, to Verizon, to employees and other persons not directly involved in the dispute herein, and to the flow of interstate commerce from a continuation of Respondent's unlawful conduct.

12.     There is no adequate remedy at law for the irreparable harm being caused by Respondent's unfair labor practices, as described above.

13.     Granting the temporary restraining order requested by Petitioner will cause no undue hardship to Respondent, as it remains free to engage in lawful activities.

14.     In balancing the equities in this matter, the harm to the employees involved herein, to the public interest in interstate commerce, and to the purposes and policies of the Act if immediate injunctive relief, as requested, is not granted, clearly outweighs any harm that the grant of such injunctive relief will work on Respondent.

15.     Upon information and belief, to avoid the serious consequences set forth above, it is essential, just, proper, and appropriate for the purposes of effectuating the policies of the Act and avoiding substantial, irreparable and immediate injury to such policies, to the public interest, and the employees involved herein, and in accordance with the purposes of § 10(l) of the Act, that, pending final disposition of the matters presently pending before the Board, Respondent be enjoined and restrained as herein prayed.

**WHEREFORE**, Petitioner prays:

1.     That the Court issue a Temporary Restraining Order forthwith enjoining and restraining Respondent, its officers, agents, representatives, servants, employees, attorneys, and all members and persons acting in concert or participation with them, for a period of five (5) days' duration from the date of that Order, as provided for in Rule 65(b) of the Federal Rules of Civil Procedure and pursuant to the provisions of the Act, from

(a)     Engaging in any picketing or other conduct with an object to induce or encourage individuals employed by Fairfield Inn & Suites, Courtyard New York/Times Square, Hampton Inn Garden City, Hilton New York JFK Airport, Residence Inn New York The Bronx, and Grand Hyatt New York and other persons engaged in commerce or in industries affecting commerce to refuse to handle goods or perform services, in furtherance of Respondent's dispute with Verizon; and

(b)     Threatening, restraining, or coercing any other person engaged in commerce, or in an industry affecting commerce, to cease handling, using, selling, transporting, or otherwise dealing in the products of, or to cease doing business with Verizon, or any other person engaged in commerce, or in an industry affecting commerce, or with each other.

2.     That, to assure compliance with the Court's Temporary Restraining Order, the Court direct service of said Order upon the United Stated Marshal for the Eastern District of New York, and further direct the United States Marshals Service to take those actions deemed necessary to enforce the provisions and prohibitions set forth in this Order.

3.     That the Court grant such other and further relief as may be just and proper.

DATED at Brooklyn, New York this 9th day of May, 2016.

Kimberly A. Walters
Nancy Lipin
National Labor Relations Board
2 MetroTech Center, 5th Floor
Brooklyn, NY 11201
Telephone: (718) 330-2844
Email: Kimberly.walters@nlrb.gov
          Nancy.lipin@nlrb.gov
*Counsel for the Petitioner*

List of Exhibits

1. Amended Charge filed May 5, 2016
2. Complaint and Notice of Hearing issued May 6, 2016
3. Affidavit of Sohan Sheikh
4. Affidavit of John Schafer
5. Affidavit of Alexander Sikorski
6. Statement of Shunta Scippio
7. Screenshot from CWA Local 1109 Facebook page
8. Video from Fairfield Inn and Suites Brooklyn on April 25, 2016
9. Affidavit of James Penry
10. Video from Residence Inn New York The Bronx on April 26, 2016
11. Affidavit of Brigitt LaVigne
12. Affidavit of John DiBenedetto
13. Video from Hilton New York JFK on April 29 and May 2, 2016
14. Affidavit of Debra Goldman
15. Affidavit of Peter Davies

INTERNET
FORM NLRB-508
(2-08)

**Amended CHARGE AGAINST LABOR ORGANIZATION OR ITS AGENTS**

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

FORM EXEMPT UNDER 44 U.S.C 3512

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 29-CC-175331 | Date Filed 5/6/16 |

INSTRUCTIONS: File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

| 1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT | | |
|---|---|---|
| a. Name<br>Communications Workers of America - District 1 | b. Union Representative to contact<br>Amy Young, Esq. | |
| c. Address (Street, city, state, and ZIP code)<br>80 Pine Street, New York, NY 10005 | d. Tel. No.<br>212-344-2515 | e. Cell No. |
| | f. Fax No. | g. e-Mail<br>ayoung@cwa-union.org |

h. The above-named organization(s) or its agents has (have) engaged in and is (are)engaging in unfair labor practices within the meaning of section 8(b), subsection(s) *(list subsections)* 4(i) and (ii) (B) of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

The Union is engaging in unlawful secondary activity targeted at hotels that provide board and lodging to Verizon employees that are working during the CWA's strike against Verizon, with the objective of having the hotels stop doing business with Verizon and evict Verizon employees staying at the hotels during the strike. The Union is also inducing and encouraging hotel and other third-party employees to engage in a strike or to refuse in the course of their employment to use, transport, or otherwise handle or work on certain goods, articles, materials, or commodities or refuse to perform services.

| 3. Name of Employer<br>Verizon New York Inc., Verizon Corporate Service Corp.  Verizon Services Corp., and Empire City Subway Company (Limited) | 4a. Tel. No.<br>703-351-3057 | b. Cell No. |
|---|---|---|
| | c. Fax No. | d. e-Mail<br>donald.b.haller@verizon.com |

| 5. Location of plant involved (street, city, state and ZIP code)<br>1095 Avenue of the Americas, New York, NY 10036 | 6. Employer representative to contact<br>Donald B. Haller, Esq. |
|---|---|

| 7. Type of establishment (factory, mine, wholesaler, etc.)<br>Telecommunications | 8. Identify principal product or service<br>Telecommunications | 9. Number of workers employed<br>more than 30,000 |
|---|---|---|

| 10. Full name of party filing charge<br>Verizon New York Inc., Verizon Corporate Service Corp., Verizon Services Corp., and Empire City Subway Company (Limited) | 11a. Tel. No.<br>212-326-3923 | b. Cell No.<br>917-579-5216 |
|---|---|---|
| 11. Address of party filing charge (street. citv. state and ZIP code.)<br>1095 Avenue of the Americas, New York, NY 10036 | c. Fax No. | d. e-Mail<br>jkastin@jonesday.com |

| 12. DECLARATION | Tel. No. 212-326-3923 |
|---|---|
| I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.<br><br>By _____ Jessica Kastin - attorney<br>(signature of representative or person making charge)   (Print/type name and title or office, if any) | Cell No. 917-579-5216 |
| | Fax No. |
| Jones Day<br>Address 222 E. 41st Street, New York, NY 10017 _____ (date) 5/5/16 | e-Mail  jkastin@jonesday.com |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

NLRB-REGION 29
RECEIVED

2016 MAY -6  AM 9:26

BROOKLYN, NY.

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 29

**COMMUNICATIONS WORKERS OF AMERICA**

**And**                                                              Case 29-CC-175331
**VERIZON NEW YORK, INC., VERIZON**
**CORPORATE SERVICES CORP., VERIZON**
**SERVICES CORP. AND EMPIRE CITY SUBWAY**
**CO. (LTD.)**

### COMPLAINT AND NOTICE OF HEARING

This Complaint and Notice of Hearing is based on a charge filed by Verizon New York,

Inc., Verizon Corporate Services Corp., Verizon Services Corp. and Empire City Subway Co.

(Ltd.) (Charging Party or Verizon).  It is issued pursuant to Section 10(b) of the National Labor

Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and

Regulations of the National Labor Relations Board (the Board) and alleges that Communications

Workers of America (CWA or Respondent) has violated the Act as described below.

1. The charge in this proceeding was filed by the Charging Party on May 2, 2016, and a
   copy was served on Respondent by U.S. mail on May 3, 2016.

2. The amended charge in this proceeding was filed by the Charging Party on May 5,
   2016, and a copy was served on Respondent by U.S. mail on May 6, 2016.

3. At all material times, the Charging Party has been a domestic corporation with an
   office and place of business located at 140 West Street, New York, New York, and
   with various offices and facilities located throughout the State of New York and
   vicinity, and is engaged in the business of providing telecommunications services.

4. In conducting its operations Charging Party annually:

   a.  derives gross revenues in excess of $1,000,000; and

   b.  purchases and receives at its various New York facilities goods and services
       valued in excess of $50,000 directly from points located outside the State of New
       York.

5.  At all material times, the Charging Party has been an Employer engaged in commerce
    within the meaning of Section 2(2), (6), and (7) of the Act.

6.  At all material times, Respondent Communication Workers of America has been a
    labor organization within the meaning of Section 2(5) of the Act.

7.  At all material times, the following individuals have held the positions set forth
    opposite their names and have been agents of Respondent within the meaning of
    Section 2(13) of the Act:

    -Tony Spina                           President of CWA Local 1109

    -John Joseph ("Val") Valentino   Business representative of CWA Local 1101

    -Alphonse Russo                      Vice-president of CWA Local 11018.

8.  At all material times, Respondent has been engaged in a labor dispute with the
Charging Party.

9. At no material time has Respondent been engaged in a labor dispute with the following
entities:

    a.  Fairfield Inn located at 181 3rd Avenue, Brooklyn, New York.

    b.  Marriott Courtyard located at 114 West 40th Street, New York, New York.

    c.  Hampton Inn located at One North Avenue, Garden City, New York.

    d.  JFK Hilton Hotel located at 144-02 135th Avenue, Queens, New York.

    e.  Marriott Residence Inn located at 1776 Eastchester Road, Bronx, New York.

    f.  Grand Hyatt Hotel located at 109 East 42nd Street, New York, New York.

2

10. About April 15, 2016, Respondent, at the Marriott Courtyard, by individuals aligned with Respondent whose identities are currently unknown, picketed and appealed to employees of the Marriott Courtyard to cease lodging employees of Charging Party, in support of its dispute with the Charging Party described above in paragraph 8.

11. About April 25, 2016, in support of its dispute with Verizon described above in paragraph 8, Respondent, by Valentino and Russo at the Grand Hyatt lobby, threatened to picket the hotel the following day.

12. About April 26, 2016, Respondent, at the Grand Hyatt Hotel, by Valentino, Russo and other individuals aligned with Respondent whose identities are currently unknown, picketed and appealed to employees of the Grand Hyatt Hotel to cease lodging employees of Charging Party in support of its dispute with the Charging Party described above in paragraph 8.

13. About April 25, 2016, Respondent, at the Fairfield Inn, by Tony Spina and other individuals aligned with Respondent whose identities are currently unknown, picketed and appealed to employees of the Fairfield Inn to cease lodging employees of Charging Party in support of its dispute with the Charging Party described above in paragraph 8.

14. About April 26, 2016, Respondent, at the Marriott Residence Inn, by individuals aligned with Respondent, whose identities are currently unknown, picketed and appealed to employees of the Marriott Residence Inn to cease lodging employees of Charging Party, in support of its dispute with the Charging Party described above in paragraph 8.

3

15. About April 28, 2016, Respondent, at the Hampton Inn, by individuals aligned with Respondent whose identities are currently unknown:

    a. picketed and appealed to employees of Sysco to not deliver bottled water to the Hampton Inn in support of its dispute with the Charging Party described above in paragraph 8; and

    b. picketed and appealed to employees to cease lodging employees of Charging Party in support of its dispute with the Charging Party described above in paragraph 8.

16. About April 29 through May 2, 2016, Respondent, at the JFK Hilton Hotel, by individuals aligned with Respondent whose identities are currently unknown, picketed and appealed to employees of the JFK Hilton Hotel to cease lodging employees of Charging Party in support of its dispute with the Charging Party described above in paragraph 8.

17. By the conduct set forth above in paragraphs 10 through 16, Respondent has induced or encouraged individuals employed by Fairfield Inn, Marriott Courtyard, Hampton Inn, JFK Hilton, Marriott Residence Inn and Grand Hyatt Hotel and other persons engaged in commerce or in industries affecting commerce to refuse to handle goods or perform services, and has threatened coerced or restrained Fairfield Inn, Marriott Courtyard, Hampton Inn, JFK Hilton, Marriott Residence Inn and Grand Hyatt Hotel and other persons engaged in commerce or in industries affecting commerce.

18. An object of Respondent's conduct described above in paragraphs 10 through 16 has been in part to force or require Fairfield Inn, Marriott Courtyard, Hampton

4

Inn, JFK Hilton, Marriott Residence Inn and Grand Hyatt Hotel and other persons
to cease doing business with Verizon.

19. An object of Respondent's conduct described above in paragraph 15 has been
in part to force or require Sysco and other persons to cease handling or otherwise
dealing in the products of, and to cease doing business with Hampton Inn, and
other persons, in order to force or require Hampton Inn to cease handling or
otherwise dealing in the products of, and to cease doing business with Verizon.

19. By the conduct described above in paragraphs 10 through 18 Respondent has been
violating Section 8(b)(4)(i)(B) and 8(b)(4)(ii)(B) of the Act.

20. The unfair labor practices of Respondent described above affect commerce within
the meaning of Section 2(6) and (7) of the Act.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules
and Regulations, it must file an answer to the complaint. The answer must be **received by this
office on or before May 20, 2016, or postmarked on or before May 19, 2016**. Respondent
should file an original and four copies of the answer with this office and serve a copy of the
answer on each of the other parties.

An answer may also be filed electronically through the Agency's website. To file
electronically, go to www.nlrb.gov, click on **E-File Documents,** enter the NLRB Case Number,
and follow the detailed instructions. The responsibility for the receipt and usability of the answer
rests exclusively upon the sender. Unless notification on the Agency's website informs users that
the Agency's E-Filing system is officially determined to be in technical failure because it is

unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

Any request for an extension of time to file an Answer must, pursuant to Section 102.111(b) of the Board's Rules and Regulations, be filed by the close of business on May 20, 2016. The request should be in writing and addressed to the Regional Director of Region 29.

## NOTICE OF HEARING

**PLEASE TAKE NOTICE THAT** on **June 9, 2016, at 9:30 am at Two Metrotech Center, Brooklyn, New York,** and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint. The procedures to be followed at

6

the hearing are described in the attached Form NLRB-4668.   The procedure to request a

postponement of the hearing is described in the attached Form NLRB-4338.

     Dated:  May 6. 2016

JAMES G. PAULSEN
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 29
Two Metro Tech Center
Suite 5100
Brooklyn, NY 11201-3838

Attachments

Communication Workers of America
Case 29-CC-175331

## Confidential Witness Affidavit

I, <u>Sohan Z. Sheikh</u> , being first duly sworn upon my oath, state as follows:

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My home address is: 3607 Cole Avenue, Unit 212, Dallas, TX 75204

My home telephone number (including area code) is

My cell phone number (including area code) is (609) 439-7463

My e-mail address is szsheikh1985@gmail.com

I am employed by Verizon

located at     2400 N. Glenville Drive, Richardson, Texas

1       I am employed by Verizon ("Employer") as a senior analyst in the Pricing Contract

2   Management (PCM) team.  My job duties include supporting two sales team within the corporate

3   vertical, working on large deals that come to the Employer from corporate clients.  My role could

4   involve determining custom pricing for clients, customizing terms and conditions for client

5   contracts, reviewing customer requests for credits, incentives, discounts and things of that nature.

6       I am currently staying in New York City on an emergency work assignment as a field

7   technician repairing copper lines.  I have performed work during this assignment at various

8   locations in Manhattan south of Central Park.  I arrived in New York on April 13, 2016.  I

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  Additional information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary.  However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initials _SZS_

| Cases 29-CC-175331 | | | Confidential Witness Affidavit |

1   initially stayed at the Marriot Courtyard hotel on West 40th Street. I checked out of that hotel on

2   April 22 as a result of incidents that involved agents of Communication Workers of America,

3   District 1 ("Union" or CWA).

4        On April 15, 2016 at about 7:20 a.m., I started hearing loud noises coming from outside

5   the hotel room where I was staying. My room was on the 26th floor of the hotel. It sounded like

6   air horns, whistles, "clappers" (i.e., items making loud clapping noises), and shouting. I had

7   experienced picketing before, so I suspected that the noises I heard were coming from Union

8   picketers in the street. I walked to the window in the hotel room and looked down. I saw

9   numerous red signs and banners either draped over vehicles parked on the street or draped over

10   police barricades that I could see set up on the side of the street opposite the hotel. I could not

11   see what the signs or banners said from my window. I also could see about 20 people pacing

12   about the sidewalk, or moving up and down the street, directly in front of the hotel. Most of the

13   people I saw were on the same side of the street as the hotel, and a few were on the opposite side,

14   both on the sidewalk and in the road. I estimate that I could see about 20 people from my 26th

15   floor window, but my view of the side of the street where the hotel is located was obscured from

16   my vantage point. I believe, based on the amount of noise they were generating, that there were

17   more people there directly in front of the hotel in the area where my view was obscured, perhaps

18   as many as 50 people. Many of the people I saw were wearing red, which I know is the color

19   associated with the CWA. I did not go downstairs to see the protest up close because I was

20   afraid that the protesters would identify me as a Verizon employee, and I wanted to avoid any

21   confrontations.

22        I called the hotel front desk and asked if they knew what was going on outside the hotel

23   with all the noise. The hotel staffer I spoke with said that it was a protest about Verizon.

Initials: _SZS_

| Cases 29-CC-175331 | | Confidential Witness Affidavit |
|---|---|---|

1       I called my supervisor and told him about the situation. I was preparing to leave for my

2     work assignment that day, *as I do every day SZS* but I was afraid to leave the hotel because I was afraid that the

3     protesters would recognize me as a Verizon employee and start harassing me as a result. I told

4     my supervisor that I did not want to leave the hotel, and he told me to wait out the protest and try

5     to leave after it dies down. I then called my partner, Fowler, with whom I was performing the

6     work, and I told him that we would have a delayed start to the day because of the protest. I then

7     tried to go back to sleep, but I was unable to because the noise coming from the protest down on

8     the street was deafening. The noise from the street persisted until about 9:20 am. When I heard

9     the noise end, I looked out of my window again and down to the street, and I saw that the people

10    in red and the signs and banners that had been there previously were all gone. At that point, I

11    called Fowler and told him to come pick me up in a taxi from the back entrance to the hotel. I

12    left out of the back of the hotel with no incident. I got into the taxi with my partner, and we went

13    on to perform the day's work.

14       I returned to the hotel at about 7 pm. Shortly after I got back to my room, Fowler called

15    me and told me that our supervisor told him that both Fowler and I had to go downstairs and

16    speak with the hotel front desk because the hotel wanted to kick all Verizon people out of the

17    hotel. Fowler was staying at another Marriott hotel, the Residence Inn located 42nd Street and

18    Avenue of the Americas. He said that he had been informed that his hotel was also asking

19    Verizon people to leave.

20       I then called the front desk. I asked them if it was true that the hotel was kicking Verizon

21    employees out of the hotel. The hotel representative I spoke with said that the hotel was not

22    kicking Verizon employees out, but that the hotel was suggesting that we move to another

23    property for our safety, and Marriott would provide alternative accommodations. I told the hotel

Initials: SZS

| Cases 29-CC-175331 | | Confidential Witness Affidavit |

1    representative that I wanted to play it by ear over the next day or two and make a decision based

2    on how things went then.  The hotel representative said that it was ok for me to stay and play it

3    by ear as I had suggested.

4         I then called my partner Fowler.  He told me that the hotel he was staying at was in fact

5    kicking Verizon people out of that hotel.  He said that he was with a bunch of Verizon people

6    who Marriott had asked to gather in the lobby of the hotel in order to talk about going to a

7    different location.  After I spoke with Fowler, I got a call from another Verizon employee on

8    emergency assignment named Trenton.  I knew Trenton already because we work together in the

9    same office in Richardson, Texas.  Trenton was staying at the same Courtyard hotel where I was

10   staying, and he told me that when he came back to the hotel his room key had been disabled.  He

11   asked me whether my key was still working, and I told him what happened with me.  Trenton

12   said that he was in the lobby speaking with a manager of the hotel, and I said that I would come

13   down and try to figure out what was going on.

14        I went to the lobby and met at the front desk with Trenton and the hotel manager, whose

15   name I did not get.  The manager told us that the hotel is strongly suggesting that Verizon

16   employees move to a different hotel because the Union had let the manager know that things

17   would get much worse at the hotel if Verizon employees continued to stay there, that the

18   protesters would come back and would bring more people and make even more noise.  At that

19   point, I decided that I could no longer stay at the hotel because I felt that I would never have

20   peace at that hotel, feel secure there, or even be able to come and go from the hotel, given the

21   Union's threats to increase the size and volume of their protests.  I also believe that the Union

22   had somehow obtained information from Marriott regarding the fact that Verizon employees

Initials: _SZS_

| Cases 29-CC-175331 | | Confidential Witness Affidavit |
|---|---|---|

1   were staying at the hotel, so I believed that as long as I was staying there, the Union would know

2   where I was.

3        I coordinated with my partner Fowler and checked out of the hotel that night.  Fowler

4   also checked out of his hotel, and later that night, we both checked into a smaller boutique hotel

5   in Chelsea.  I know that Trenton also checked out of the Courtyard hotel, but he only moved

6   down the street to the Residence Inn where Trenton had been staying.  I estimate that there were

7   about 25 Verizon employees staying at the Courtyard hotel when I checked out on April 22.  I do

8   not know what any of the others chose to do about the situation with the Union protests.

9        I have not seen any Union protests or demonstrations at the new hotel where I currently

10   am staying.  I booked the new hotel room myself, apart from the Verizon booking system, and I

11   checked in not as a Verizon employee.  Therefore, I believe that the Union does not know that

12   Trenton and I have moved to this new hotel.

13   ///

///

///

///

///

///

///

///

///

///

- 5 -

Initials: _SZS_

| Cases 29-CC-175331 | | Confidential Witness Affidavit |

I have been given a copy of this Confidential Witness Affidavit.  I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this Confidential Witness Affidavit consisting of six (6) pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.

Date:   May 3, 2016                          Signature:

Sohan Z. Sheikh

Signed and sworn to before me on _____ May 3, 2016 _____ at

Brooklyn, New York

Matthew A. Jackson
Field Attorney
National Labor Relations Board
Region 29

Initials: _____

Communications Workers of America -
District 1 (Verizon New York Inc.,
and Empire City Subway Company
(Limited))
Case 29-CC-175331

## Confidential Witness Affidavit

**I, John Schaffer, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My work telephone number (including area code) is          646-213-6725

I am employed by          Grand Hyatt New York, located at 109 East 42nd street, New York, NY

1.   I was hired by Grand Hyatt New York, herein the Hotel, during November 2015. I am the

     area Vice President and General Manager of the Hotel. My general duties include overseeing

     all operations for the Hotel.

2.   On or about April 25, 2016 (all dates are 2016 unless otherwise noted), I spoke with Val

     Valentino and Al Russo, from CWA. I spoke with them down in the lobby. Valentino and

     Russo said, We know that Verizon people are staying in the Hotel, we don't have an issue

     with you, but we have a problem with these people taking our jobs. They said, If this

     continues (meaning, in context of the conversation, our lodging of Verizon employees), we

     may have to picket. That was the end of our brief conversation.

3.   On or about April 26 at approximately 7:00a.m., while in my residence on the 32nd floor of

     the Hotel, I heard various noises, such as horns and other noise makers. I went downstairs

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.
The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings
or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional
information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary. However, if
you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you
a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                              Initials 

and spoke with the Hotel's Director of Security, Ron Rutolo.  I then observed approximately 100 people dressed in red with CWA signs stating something to the effect of: Our fight is not with Grand Hyatt; We have nothing against Hyatt; CWA on Stike.  They were located on the sidewalk outside of the 42nd street entrance of the Hotel. I observed police officers set up around the front doors of the Hotel where guests could get in and out of the Hotel and the public could walk on the sidewalk. In addition to the various noise makers, I heard the crowd chanting slogans, including, but not limited to "Verizon out Now."

4.  On April 26, I was notified by either Liz Harris or Ron Rutolo or both, that there was also a protest outside of the Hotel's employee entrance. I did not directly observe the protest outside of the employee entrance. The employee entrance is a locked entrance and is marked with the Hotel's logo.

5.  At approximately 11:00a.m., I had a meeting with the union which represents employees at the Hotel, Local 6, New York Hotel and Motel Trades Council, including its business agent (name unknown at this time) and approximately 14 other shop stewards and delegates. They told me that they were concerned that their members would be uncomfortable crossing a picket line (referring to what was happening in front of the Hotel).  I asked them for 24 hours so we could find a conclusion that worked for everyone. They agreed.

6.  Shortly after the meeting described above, I spoke again with Val Valentino and Al Russo from CWA and several others I do not presently know the names of. I told them, give us 24 hours to see if we can resolve this situation.  We shook hands. That was the end of the conversation. I do not recall them saying anything about Verizon employees staying at the Hotel during this conversation.

- 2 -

Initials: 

7.  Later on this same day, April 26, I had two conference calls with the Hotel's customers at Verizon, including Viju Menon, Senior Vice President, and approximately 4 others from Verizon. For Hyatt, myself, Brad Mettler, Director of Sales, Ash Awasthi, Hotel Manager, and Liz Harris, Director of Human Resources. I said, We've had conversations today with our union and they are uncomfortable and may not be able to cross a picket line and we will not be able to service our guests or Verizon's employees. I don't recall saying anything about my conversations with CWA. I said, We are in the position that we will need to assist you in finding alternate accommodations for your employees. The second call that we had with Verizon, dealt mainly with the logistics with how to relocate the Verizon employees. I was on this call only for a few minutes.

8.  It is my understanding that prior to the events described above, Verizon occupied approximately 45 rooms on a week to week basis at the Hotel. After the April 27th departures, the Hotel did not immediately fill these vacant rooms, causing the Hotel to lose revenue.

9.  After the events described above on April 26, there have been no further protests or actions by CWA at the Hotel.

/

/

/

/

**I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

- 3 -                        Initials: 

Case 29-CC-175331                                               5/3/2016

I have read this Confidential Witness Affidavit consisting of 4 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.

Date:   May 6, 2016 _____   Signature: _____

John Schaefer

Signed and sworn to before me on May 6, 2016 at Manhattan, New York

_____
DAVID J. STOLZBERG
Board Agent
National Labor Relations Board

- 4 -                                       Initials: _____

> Communications Workers of America -
> District 1 (Verizon New York Inc.,
> and Empire City Subway Company
> (Limited))
> Case 29-CC-175331

## Confidential Witness Affidavit

**I, <u>Alexander Sikorski</u>, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 111 Ameena Chase Trail, Mooresville, NC 28117

My cell phone number (including area code) is 704-903-2673

My e-mail address is alexander.sikorski@verizon.com

I am employed by Verizon

located at 908 North College Street, Charlotte, NC 28206

1. I have worked for Verizon for 23 years. I usually work in North Carolina as Senior Engineer. I design private networks for large corporate clients, so that they can connect building to building and between cities.

2. Last year, my Employer had asked for volunteers in case there was a strike in the future. I volunteered. On the morning of April 13, 2016, I received a call from corporate saying I had been deployed. My work assignment was at 70 Central Avenue, Brooklyn, New York. I drove up to New York that same day. I booked a hotel through the Corporate Travel center. I chose the hotel based on its location to where I was assigned to work.

3. I checked into my hotel, the Fairfield Inn at 181 3rd Avenue, Brooklyn, New York, on April 13, 2016. I have stayed there through the present. There were about 5-8 other Verizon employees staying at the same hotel at that point. I believe more Verizon

- 1 -                                        Initials: _____

employees have since checked in. My room is on the 9th floor in the back of the building. My window faces Butler Avenue, on the far end of the hotel from 3rd Avenue.

4.  On Monday, April 25th at about 5:00 am, I was woken up to the sound of base drums, trombones, air horns, and whistles. The noise was very loud, even on the 9th floor with my window shut. I looked out my window and could see to 3rd Avenue. I saw people with red shirts that say CWA marching up and down 3rd on the sidewalk. I saw people with the drums and the other instruments. I believe there were about 20-30 people at that point. They were yelling "Scabs go home" and "Kick them out." The people were wearing large signs (about three feet tall) that said "picketing Verizon, not hotel" or signs with the CWA insignia. I called Verizon security and reported what was going on.

5.  I then left my room and went down to the lobby. I looked out the glass door in the lobby. I could see people all the way from Bulter to Douglass outside the hotel on 3rd Avenue. They were marching on the sidewalk on both sides of 3rd Avenue. There were at least 50 people. They were still chanting the same things. The Union marchers also had signs that say honk for CWA so there were many trucks driving down 3rd Avenue honking as well. I saw a guy with a bullhorn. He was wearing the same CWA shirt as everyone else. They were still playing the instruments and chanting.

6.  I went to the breakfast area, which is a half level below the lobby. It was about 6:00 am and I was the only guest in the breakfast area. The breakfast area was usually packed at that time. I could hear the loud noises from the street and see them up through the window marching. There were hotel employees in the breakfast area that kept apologizing to me for the noise.

Initials: ___**\S.**___

7. I walked out of the breakfast area and up to the lobby. There were families at the front desk complaining that their children were scared. They were asking the hotel staff what was happening. I looked out the front and saw the picketers blocking a car from leaving the hotel parking lot. The picketers were walking very slowly in front of the car and glaring at the driver. The car eventually was allowed to leave after a few minutes. Around that time, cops arrived to the hotel. I don't know if the cops were outside previously because I did not go outside at that time. I then went back to my room.

8. I talked to some of my coworkers who were staying at the same hotel about what was going on and we decided not to leave. I also talked to my Manager, Emile Hill, who said to just hang low.

9. The noise continued until about 8:00 am when it started dying down. I looked out my window and saw the marchers dispersing.

10. I received a phone call from the manager of the hotel, I do not remember her name but I would recognize her. She is an African American woman I have seen in the hotel many times before. She apologized because she thought I was the one in the car trying to leave. I told her it wasn't me, I was still upstairs. I said, since they dispersed, I'm going to head down and I'll talk to you then.

11. I went downstairs and met the Manager at the desk inside the lobby. She apologized again and said that one of my coworkers was scared for his life and he was checking out and was going home regardless of whether he gets let go. She said, another of your coworkers changed hotels. She said that the Union found out we were there because someone from the Union came into the hotel and asked her whether the hotel accepts Verizon discounts. She said she told the person yes, they have Verizon discounts. Then

Initials: _N.S._

the person asked whether there were any of their Verizon coworkers there. She told them

yes. The Manager told me that the Union was walking around the parking lot and taking

pictures of all of the cars with out of state plates. She said one of the Union marchers said

that if the cars with out of state plates were still there the next day, they will be back at 2

am. She said she was able to get rid of the Union people by saying that she only had two

Verizon people here and one checked out and the other went to another hotel and he

drove past you all and you didn't know it. She told me she isn't going to kick me out of

the hotel like others because she values Verizon's business and she is concerned for my

safety so I have permission to leave the hotel from any of the exits but she would

appreciate if I didn't park in the parking lot and instead parked at a secured garage a

couple of streets down. I asked her about the bill, because I needed a copy to submit to

Verizon for reimbursement. She said she credited me for last night. I asked why. She said

they ended up crediting everyone in the whole hotel for the previous night because it is

their policy for a disruption.

12. No one from the Union has come back to the hotel since April 25th that I am aware of.

13. I have seen a video posted on the Union's Facebook page that was taken outside of my

hotel on that morning. The Manager is the woman in the pink sweater talking to the

police officers and the Union representative.

14. I have not gone to my work assignment location at all since being here. I have been

dispatched all over Brooklyn through the dispatching system on our tablets. I do my work

at customer facilities. I am doing Fios ground installs and trouble repair. I drive a rental

car and do not wear any Verizon insignia. I get my first dispatch of the day while I am

still at the hotel. I typically leave the hotel at about 6:30 am and then do not return until

- 4 -                                    Initials: _A.S._

5/3/2016

the end of my work day at about 7:00 pm. I do not do any work while I am at the hotel.

None of the other Verizon employees are doing any work at the hotel either because of

the type of work that is being done on these emergency assignments.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 5 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

**Date:**  May 3, 2016                **Signature:**  _____

Alexander Sikorski

Signed and sworn to before me on **May 3, 2016**  at **Brooklyn, NY**

_____
**Kimberly Walters**
**Board Agent**
**National Labor Relations Board**

Initials: _____

<u>DECLARATION OF SHUNTA SCIPPIO</u>

I, Shunta Scippio declare as follows

      1.      My name is Shunta Scippio. I am over the age of 18 and otherwise competent to make this declaration.

      2.      I am currently employed as a Guest Service Agent at the Fairfield Inn & Suites located at 181 Third Avenue in Brooklyn. I normally work during an overnight shift.

      3.      For several weeks, employees of Verizon have been staying at the hotel.

      4.      On April 25, 2016, at approximately 5 am, dozens of people in red shirts began picketing the hotel. The picketers stayed passed 8 o'clock in the morning.

      5.      The picketers carried signs stating "CWA on Strike" and were very loud using drums horns. They blocked entrances and exits from the hotel, including the entrance and exit to the hotel parking lot, preventing guests from leaving the parking lot.

      6.      The hotel called the police, but the police stated that they could not do anything to stop the picketers.

      7.      Before the picketers left, one picketer told me that they would be back at 2 am if they saw any out-of-state license plates in the parking lot. I understood this to be a threat that the picketers would continue to disrupt service at the hotel unless we kicked any Verizon employees out of the hotel. I informed guests who were Verizon employees that they should consider parking their cars elsewhere to avoid further picketing. The hotel did not kick any guests out of the hotel.

      8.      I have personal knowledge of the foregoing facts and they are all true and correct.

Name _____

Shunta Scippio

ook.com/search/top/?q=cwa%20local%201109

Safety ▼   Tools ▼   ⌕ ▼   📖

Previous   Next   | 🖉 Options ▼ |

⌕   Jessica   Home   🌐¹

People   Photos   Videos   Pages   Places   Groups   Apps   Events

**CWA LOCAL 1109**
April 25 at 8:26am · 🌐

👍 Like Page

CWA Local 1109, great job this morning. Scabs will no longer be staying at this Hotel. Solidarity



👍😮😆 791          101 Comments   925 Shares   57K Views

👍 Like      💬 Comment      ↪ Share

Communications Workers of America -
District 1 (Verizon New York Inc.,
and Empire City Subway Company
(Limited))
Case 29-CC-175331

## Confidential Witness Affidavit

**I, James Penry, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at        107 Minute Man Drive, Cary, North Carolina 27513

My cell telephone number (including area code) is  919-219-5841

I am employed by        Verizon        ~~Weston~~ JP

located at        640~~0 Westin~~ Parkway, Cary, North Carolina 27513

1. I was hired by Verizon, herein the Employer, during 1996. I currently work in the capacity of manager in customer service management. My general duties include managing 12 employees who themselves manage customer accounts and maintain client relationships.

2. It is my understanding that on or about April 13, 2016 (all dates 2016 unless otherwise noted) employees of the Employer went on strike.

3. On or about April 13 I arrived to New York City for my emergency work assignment (EWA) due to the strike. My EWA is FIOS installation and maintenance technician, which includes pole climbing.

4. Since arriving on April 13, I have been staying at the Marriott Residence Inn, located at 1776 Eastchester Road, Bronx, New York. Though I am not sure of the precise number, it is my

**Privacy Act Statement**

The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initials

estimation there are approximately 30 other employees of the Employer staying at this same Hotel.

5. The work I perform is assigned by the Employer's dispatch resource center (DRC). These assignments are sent by DRC to an Employer provided tablet. I carry this tablet with me while I am working throughout the day.  The tablet itself is used to perform some of the diagnostic functions I perform in my EWA with customers. The work I perform during the day is out of a Verizon truck, which is parked at the 2885 Jerome Avenue facility in the Bronx. Each morning, I arrive to the Jerome Avenue facility and pick up a truck and leave my rental car at the same Jerome Avenue facility.  At the end of the day, I bring the tablet back to the Jerome Avenue facility. At this facility, I go through my tablet to make sure all of my jobs are closed out. After this, I pack tablet in the bag and drive it to the hotel's parking lot or an adjacent parking deck next to the hotel. I usually keep the tablet in the rental car.

6. I have a work cell phone provided to me by the Employer. This was provided to me while I was working in Cary and prior to my current EWA. This phone is typically used for work purposes. While on this current EWA, I have not used my work cell phone to perform work for the Employer while at the hotel. I have received phone calls on this work cell phone while in the field during this current EWA. I do not perform any work at the hotel.

7. On or about April 26 at approximately 630 in the morning, I heard honking and horns outside of my hotel room on the 5th floor. My windows face Bassett Avenue. I looked out of my windows and observed approximately 100 people in red shirts. I opened my window and could hear the people chanting, "Send them home," "make them go," and "make them leave." There may have been other chants that I cannot recall at this time. I also heard loud airhorns, loud whistles, a loud chirp, which sounded to me like a police siren chirp. I saw the

people holding signs while walking an oval shaped route on Bassett Road. I also saw some of these people with signs hanging around their necks. Other than the signs saying CWA, I couldn't read what the signs said specifically. I filmed with my work cell phone a short video of the activity that I observed that morning from my hotel window.

8. After I got dressed that morning in my EWA attire, I determined that I should not exit the hotel dressed in a way in a way identifiable by the protesters. I changed my outfit. At approximately 7:15a.m. I left for the rental car which was parked on the second level of the parking deck located next to the hotel. As I was walking to my car, I walked past three men wearing red CWA shirts or red shirts. I said to them, Whoa what's going on? That's really loud. One of the men responded, Yeah, and It's going to get a lot louder. That was the end of the conversation. From the parking deck, I filmed another short video on my work cell phone. I also observed the usually empty parking deck full with cars being exited by people wearing red shirts. I also observed from the parking deck the people walking in an oval along Bassett Road, loud air horns, and the same chanting in yelling voices as described above. I also observed either security guards or policemen standing in the parking lot area of the hotel. From my car, I called the hotel's front desk to let them know that the parking deck was full with demonstrators' cars. The front desk person told me that they would take care of it. I then exited the parking deck where the demonstrators were located. As I was driving out of the parking lot, I continued to be able to hear the chanting from the demonstrators. The demonstrators did not stop my car or attempt to speak with me. I did not recognize any of the demonstrators at the hotel.

9. The following day, April 27, while at the hotel, I heard a single air horn honk at approximately 6a.m. I looked out of my hotel window and observed one female in a red shirt

Initials: _____

in a barricaded area on Bassett Road. I did not hear this person chanting during this time.

Since this date, I have not observed demonstrators outside the hotel on Eastchester Road.

10. Since April 27, I have observed a police car present on Bassett Road during the morning

when I leave for work and during the evening when I return from work.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 4 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

**Date:**  May 3, 2016                     **Signature:**  _James Perry_

James Perry

**Signed and sworn to before me on May 3, 2016 at Brooklyn, New York**

DAVID J. STOLZBERG
**Board Agent**
**National Labor Relations Board**

Initials: _____

Communications Workers of America -
District 1 (Verizon New York Inc.,
and Empire City Subway Company
(Limited))
Case 29-CC-175331

## Confidential Witness Affidavit

**I, Brigitt LaVigne, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 60 Blue Jay Way, Rexford, NY 12148

My cell telephone number (including area code) is   518-469-0569

I am employed by       Verizon Communications

located at       158 State Street, Albany, NY 12207

1.  I was hired by Verizon Communications, herein the Employer, during June 1998. I currently
    work in the capacity of National Operations Center Support. My general duties include
    capacity management and support for Verizon regions, from Virginia to New York. This
    includes determining how many customers can be serviced in the field per day.  Prior to
    April 13, 2016 (all dates below 2016 unless otherwise noted), I worked out of the Albany
    office.

2.  On or about April 13, I was assigned by the Employer to report to 741 Zeckdorf Boulevard in
    Garden City, New York. I was aware that I would be assigned this post in the event that the
    unionized workers went on strike. The CWA union went on strike on April 13. In addition to

**Privacy Act Statement**

The NLRB is asking you for the information on this form under the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initials

the same duties that I performed in Albany described above, I now perform other staff

support for the Long Island and Upstate New York field operations.

3. Upon arriving in ~~New York~~ Garden City NY on April 13, I checked in to Hampton Inn, located at 1 North

Avenue, Garden City. I booked this hotel using the Employer's website portal. It is my

understanding that a few other Verizon employees from out of town were staying at the same

hotel. At this time, I am unaware of the names of the other employees.

4. On or about April 28 at 5:45 a.m., I left the front lobby of the hotel. I observed 20 to 30 men

in red shirts standing in the road, which, at this time I believe to be North Avenue, extending

from my hotel to the Hyatt hotel. I did not recognize any of the people that I observed. I

observed them standing in groups. I then called my colleague, Josh Fahey, who was about to

pick me up in his car. I then told him not to come down the street because he would not get

through. I told him that I would meet him at the mall. The mall I was referring to is located

across East Gate Boulevard. As I was making the call, I observed one of the men in a CWA

red shirt approach a truck with SYSCO on it. I heard the man in the red shirt say to the driver

of the truck as he was unloading bottled water from the truck, Please don't make deliveries

into this building, a lot of other companies are refusing to make deliveries like UPS. The

SYSCO driver said, I'm sorry man, someone else will take my job if I don't do it. This

conversation took place right in front of the front entrance of the Hampton Inn and less than

ten feet from me. I was able to hear the conversation clearly. At that point, I walked through

the parking lots for both the Hampton Inn and the Hyatt hotel, then across East Gate

Boulevard and then into the mall parking lot where I waited for my ride.  Once I arrived to

the mall, I called the police and reported that Verizon picketers were blocking the road and

Initials: 

that I could not get my car out of the parking lot. I did not attempt to drive my car. At this time I also called Verizon corporate security and reported what I had observed.

5.  As I was walking through the parking lots to the mall, as described above, I heard and observed several people in red shirts blowing air horns including: "Don't stay at this hotel, it has bed bugs," "Don't stay at this hotel, it houses scabs," and "Go home scabs." These slogans were being amplified through a megaphone. I recall hearing the people in red shirts chanting other slogans and profanities, but I cannot recall what they were. I recall seeing the people in red shirts wearing red signs. I did not read the signs carefully but recall seeing the letters CWA on them. I do not know what else was written on the signs. I did not observe them handing out any flyers and was not personally handed any flyers. I observed as I was walking to the mall that several of people in red shirts were inflating a big pink pig.

6.  Since the April 28 incident described above, I did not observe any one protesting or chanting outside of the Hampton Inn again.

7.  At no point did anyone working for the Hampton Inn talk to me about the events described above.

8.  On or about May 2, I moved to a new hotel. I made this move out of my own volition, because I wanted more living space than was provided at the Hampton Inn.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 4 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

Date:   May 3, 2016                Signature:   _____
                                                Brigitt LaVigne

Signed and sworn to before me on May 3, 2016 at Brooklyn, New York

_____

DAVID J. STOLZBERG
Board Agent
National Labor Relations Board

Initials: _____

Communications Workers of America -
District 1 (Verizon New York Inc.,
and Empire City Subway Company
(Limited))
Case 29-CC-175331

## Confidential Witness Affidavit

**I, John Anthony DiBenedetto , being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 2464 Lakeland Drive, Grand Prairie, Texas 75054

My home telephone number (including area code) is

My cell phone number (including area code) is (817)688-7287

My e-mail address is john.a.dibenedetto@one.verizon.com

I am employed by Verizon Services Organization Inc.

located at 600 Hidden Ridge, Irving, Texas 75038

1.  I work for Verizon Services Organization Inc., the Employer, as a Senior Manager
    Database Marketing. My duties include managing a team of marketing list developers.
    They develop lists of contacts for direct marketing efforts. I work out of the Irving, Texas
    location. However, I am currently on emergency work assignment in Queens, New York
    as a fiber installation maintenance technician. This means that I am installing and
    maintaining fiber services for our Queens customers. I was deployed on April 13, 2016.

2.  For this emergency assignment I was lodging at the JFK Hilton Hotel in Jamaica, New
    York, located at 144-02 135th Avenue, New York 11436. The only activities that I

**Privacy Act Statement**

The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                                          Initials

engaged in at the Hilton Hotel were sleeping and eating. I did not perform any work or training activities at the hotel.

3.  On or about April 29, 2016, at 5:15 am, my alarm went off. When I awoke, I could hear very loud horns, whistles, air horns, and what sounded like honking and intermittent sirens. Although I was staying on the 11th floor, I could hear the noise that the people were making very clearly. I got up and looked out of the window and saw people organized on the ground. I saw about fifteen or twenty people converged at the driveway of the hotel. There is only one driveway entrance to the JFK Hilton. The people were walking in circles in front of the driveway. In addition, I could see from my room that there were people walking on the sides of the hotel. I took three videos of this activity with my cell phone. Two were taking on Friday, the 29th and the final video was taken on Sunday May 1st These videos will be forwarded to the Board agent as soon as possible. I went to take a shower and got dressed. I decided to call Verizon security. I believed that an injunction was in place that prevented these people from engaging in this type of disruptive activity at a non-work site. Verizon security took my information and advised me to go to work. While waiting for the hotel elevator I could see the back of the hotel and I saw that there were protesters out there as well, making noise, blowing horns and moving. It appeared that there were people walking the perimeter outside the hotel fence.

4.  When I got downstairs to the hotel lobby, Verizon security called me back and told me to call 911. I called 911. I let them know that there was extremely loud noise and that there were protesters that were engaging in conduct that I thought was illegal. I told the police that there was an injunction and the protesters should not be able to do this. The police told me that they would dispatch more units. I then spoke to security a few times while I

Initials: _____

was waiting for my partner to come downstairs. After a few minutes I found out that she was not coming down because it was her day off. I then proceeded to leave hotel to start my customer visits. I exited the building and got into my car. As I started to exit the parking lot I saw that the crowd had grown to about 200-250 people. I also saw that there policemen trying to physically move people out of the entrance so that I could exit the hotel parking lot with my vehicle. Most of the protesters were wearing red shirts (hoodies, teeshirts, sweatshirts.) Some of the shirts said "CWA" and some of the protesters had signs hung over their bodies that said "CWA", "Stand up to Verizon", "On strike against Verizon." There was also a giant inflatable rat. The rat had a sign on that said "Striking against Verizon Not Hotel." While I was in my car, waiting for the police to move the protesters, I saw and heard one of the protesters say to me while in front of my car and pointing at me "Hey look a Verizon scab." After he said this, I heard the protesters say to me, "you fucking scab," "scab bastard," "fucking asshole" and other profanities. The police were trying to move the protesters however, they kept swarming my car, some banging on my windows. It took me about fifteen seconds to get out of the hotel parking lot. Although a driver can turn either left or right out of the hotel parking lot, there were so many picketers that I could only drive straight. As I cleared most of the crowd, there was one guy who refused to move and the cops had to come over and physically move him. As I was leaving the protesters were not protesting in an orderly fashion, they did not have a distinct picket line. Rather, there was a mob of 200+ people blocking the exit. I went to work that day as scheduled. The protesters were not present when I returned.

Initials: _____

5. The next morning April 30th, I woke up at 5:15 am to the same loud noise as the day

before. The protesters had a drum and they were beating the drum consistently. However,

the horns were more sporadic- the horns were blown about every fifteen seconds. I

looked out the window and saw about 75 protesters again at the main driveway entrance

to the hotel. After getting myself ready for work, I went downstairs to the lobby and

exited the hotel. I went to my car and proceeded to exit the parking lot. I saw that the

police had set up barricades that the protesters could not cross. I was able to exit. The

protesters were wearing the same shirts and the rat was present again. The protesters also

had the same signs as the prior day. The protesters had the same horns and drums and

whistles. As I was exiting the hotel, I heard the same profanities being directed at me

such as "you fucking scab." I also saw that the protesters were still walking around the

perimeter of the hotel. I worked a full day and when I returned I again saw that the

protesters were not present.

6. On Sunday, May 1, 2016, when I awoke I saw and heard that the protesters were back

again and they were making the same loud noises. There were a total of about 50-75

protesters in the front and back of the hotel. Most protesters were in front. I again

prepared for work and left the hotel. Again, I had to pass through the barricades with the

protesters screaming profanities at me. The rat was back again as well. At around 10:00

am I returned to the hotel and at about 10:30 I decided to extend my stay at the direction

of the Employer. I was only booked at the hotel until May 3, 2016, and I was directed to

stay on another 21 days. I approached the front desk and informed the representative that

I wanted to extend my stay. She pulled up the screen and looked at it. She then told me

that she would not be able to extend my stay. I asked her if there was a reason. She said

Initials: _____

"I think you know the reason." I returned to my laptop to try to book a new hotel through the Employer's travel portal. The same hotel I was staying, the JFK Hilton, showed up as an available hotel for the 21 additional days that I needed to stay. I approached the front desk representative again and I asked her if they would honor an online booking if I were able to make one. She told me to hold on and she went to get a manager. Manager "Tom" came out and he related to me that they would not be extending my stay at that time, and that they would not have a decision on whether they could extend the stay until Monday. I told him that I saw that the hotel had online booking availability. I asked him if he would honor an online booking. He said that if I were able to get a confirmation number, they would honor it. I went back to work thinking that I could book my room online later. I went back to work.

7. At noon I attempted to book a room at the JFK Hilton on my tablet but there were no rooms available. I then called Hilton Honors. I relayed the situation to them and asked them to help me. I told them that I was interested in a few different hotels. The agent became confused with which hotel I was leaving and she actually offered me a room at the JFK Hilton. She told me that the JFK Hilton had plenty of availability. I turned down the offer at this time. Within five minutes of this conversation, Verizon security called me and asked me for an update. I briefed them on what was happening. I was instructed to call Hilton Honors back and accept the room that they had offered me at the JFK Hilton. I did that, I booked a room for fourteen days. I got a confirmation number. After work that afternoon, I took the confirmation number back to the hotel and asked to speak to a manager. Manager Alyssa Cappellano came out and I showed her the confirmation number and asked her if they would honor the reservation. Cappellano said she had to

- 5 -

Initials: _____

check with her manager. She went into the office and made a phone call. After about five minutes, she came out of the office to let me know that her manager Shanique Peterkins was going to contact Mark Ingram the General Manager. After about five minutes, Cappellano came back out of the office with two business cards: her card and Peterkins' card. She told me that my travel manager would be giving me a call on Monday. I asked again if they were going to honor the reservation and her response was again that my travel manager would be calling me on Monday.

8. I then went back to my room. I sent an email to Verizon Travel Manager Debra Goldmann. She then called me and indicated that the JFK Hilton was not going to honor my reservation and that she was going to attempt to make arrangements elsewhere for me.

9. The next morning May 2, when I awoke I saw and heard that the protesters were back again. They were making the same loud noises. It was about 5:15 am. When I got to the elevator, I took a video of the Union protesters making noise at the back of the hotel. There were about 20 protesters out back. In front there were about 25-50 protesters. Walking the sides of the hotel, there were about 1-2 protesters at a time. I worked the day and then I made arrangements to stay at another hotel. I left the JFK Hilton today May 3rd, and the protesters were there again this morning making loud noise. Today there were about 10-15 protesters. I am now staying a "Home 2" Suites by Hilton in Long Island City. When I was staying at the JFK Hilton it took me about 15-20 minutes to get to most customers. Now it takes me about 50 minutes to one hour to get to the area where I service customers.

Initials: _____

10. I understand that all of the approximately 30-50 Verizon employees staying at the JFK

Hilton have been told to leave the hotel.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 7 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

**Date:**   May 3, 2016                   **Signature:**   _John Anthony D. Benedetto_
                                                          John Anthony DiBenedetto

**Signed and sworn to before me on**       **May 3, 2016**               **at**

      Brooklyn, NY

Emily Cabrera
Board Agent
National Labor Relations Board

                                   Initials: _____

Communications Workers of America -
District 1 (Verizon New York Inc.,
and Empire City Subway Company
(Limited))
Case 29-CC-175331

## Confidential Witness Affidavit

**I, Debra Goldmann, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at       16 Franklin Street, Williston Park, New York 11596

My cell telephone number (including area code) is ~~516-739-2855~~   *516 2824561*

I am employed by       Verizon Communications

located at       1 Verizon Way, Basking Ridge, New Jersey 07920   *since*

1.  I was hired by Verizon Communications, herein the Employer, ~~during~~ April 1988. I currently

    work in the capacity of travel manager. My general duties include managing the Employer's

    travel program globally, including flights, hotels, car rentals, travel agency online booking

    tool, ground transportation, rail, among others.

2.  On or about April 13, 2016 (all dates 2016 unless otherwise noted), it is my understanding

    that employees represented by CWA at the Employer went on strike. On this date, it is my

    understanding that a department from the Employer contacted many employees and

    instructed them where and when to report according to their pre-assigned emergency work

    assignments (EWAs). At that time, employees utilized the Employer's online booking tool,

    which I am responsible for, as well as the American Express travel agency via phone, which I

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.
The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings
or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional
information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if
you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you
a subpoena and seek enforcement of the subpoena in federal court.

Initials

manage the contract for. It is my understanding that approximately 6,500 employees traveled to their EWA on or about April 13.

3. On or about April 22, I was called by Tracy Riess, manager of operations for the Employer. Riess told me, Some of my EWAs are being kicked out of hotels. I said, Where, what, what's going on? Riess said, Marriot Courtyard, Times Square, and another. I said, I will call them and let you know. That was the end of the conversation.

4. I then called Mark Frisone, Marriott representative. I said, Mark, what is going on, I hear there are people are being displaced at the Courtyard Times Square, we need a phone call with senior people. Frisone said, Okay.

5. This same April 22 evening, I, Peter Davies, director of strategic sourcing, and possibly one or two others from the Employer, Frisone, Ashley Kissinger, Doreen Burse, and two managers (possibly John (lnu) and Tim (lnu)) from the two Marriotts in Times Square were on a conference call.  I said, We've heard that you are asking our people to leave your hotel, I've heard their key cards have been deactivated and have been asked to leave. Manger John said, Well, we didn't really ask them to leave, we're just trying to protect them, this has been going on early mornings, sometimes all day, the picketers are outrageous, they're so loud, they have bull horns, air horns, mega phones, making so much noise that our guests on the 64th floor are complaining, we also think that a lot of them (the EWAs) are afraid as well as the other guests, especially the women. John continued, I felt like I had to do something, I called the police several times, it appears that the picketers are following the Verizon employees based on their boots and backpacks, it's causing such commotion that it is interfering with our business and we can't have this. John continued, I deactivated the keys merely to drive the people to the front desk so I could talk with them. He said that he told

- 2 -                                     Initials: _____ 

them that he would help them find another hotel, but that they couldn't stay here. Manager

Tim, from the Marriott Residence Inn said, The same thing is happening at my hotel, same

noise, same disruption, and it's just not conducive for our business, we can't have this level

of disruption, it's not fair to our other guests and overall it's not safe. I then asked John and

Tim for a list of travelers that they had identified so that I could compare that to a list that I

had from American Express. Marriott's Frisone told me that we will touch base tomorrow.

6. During this same call, the group of us discussed which Marriott hotels were union or non

union. Marriott's Frisone told me that he would provide a list of all the nonunion Marriott

hotels in the city. We discussed during the conference call Marriott's fear of a sympathy

strike and/or actions among their workers.

7. After the call, I shared the list I received from Marriott with Verizon's operation's manager

Riess. After doing this, I and Riess spoke to our superiors and drew up an action plan to

communicate with our EWAs.

8. On April 22 or 23, Riess and her staff called 40 EWAs staying at either of the Marriotts in

Times Square and provided them with instructions on how to book alternate hotels. I know

this because Riess told me she did this and I, myself, created the script for speaking with the

EWAs.

9. On or about April 24, Marriott's Frisone called me and said, There is a lot of activity,

protesting, picketing, noisemakers, air horns, chanting at the downtown Marriott. Frisone told

me that it was looking like Verizon would have to vacate the hotel. Frisone continued,

Verizon was drawing too much negative attention for the hotel, it is disturbing the other

guests, and like the other hotels it is just too disruptive. I said, Perhaps we could wait it out,

Initials: _____

maybe tomorrow will be better. Frisone said, I don't know about that. That was the end of the conversation.

10. On or about April 25, I spoke with Marriott's Frisone on the phone during the middle of the day. Frisone said, Things have not gotten any better, things this morning were exponentially worse, louder, more people, same old bull horns, air horns, all types of in your horns. Frisone continued, We can't take this, it's just too disruptive. I said, Perhaps we could reach out to the travelers and ask them to relocate. Frisone said that he would talk with his superiors.

11. Later this same day another conference call was held with the same people as were on the call as described above which took place on April 22. I cannot recall at this time whether managers Tim and John were on the call.  I said, Why? I thought this was a nonunion hotel, why is there such a push to get the people out. Frisone said, Peter Ward (head of the Hotel and Motel Trade Council) is pressuring the Marriott and threatening Marriott in calling violations in the Union hotels. Frisone said, We can't have our other Marriott hotels shut down, your Verizon travelers have got to go.  That was the end of the conversation. At some point during the conference call, Marriott representatives referred to the protesters outside of the hotels as "red shirts." It is my understanding that the CWA protesters wore red shirts during the protests.

12. I and others from the Employer began this day to contact EWAs to notify them on how to rebook hotels at other locations.

13. On or about April 26, the Employer's Riess called me. She said, Our folks are locked out of their rooms at the Grand Hyatt, their key cards have been deactivated. This same day, I set up a conference call with myself, Peter Davies, Vivek Kamath, vice president, and one other member of management from the Employer, and from the Hyatt, Jane Jordan, Lisa Arias,

Initials: _____

Gus (lnu), general manager John Schaefer from the Hyatt. Schaefer did most of the talking

for the Hyatt. Schaefer said, Things outside of the hotel had become unbearable, there were

twice as many picketers as before, maybe 200 people, carrying signs that said, "We are

picketing against Verizon, not the Hyatt." Schaefer told me that it was impossible that

Verizon employees were locked out of their room. I said, I'm sametiming someone (Kara

Oleska) who is on the phone with someone who is locked out right now. At that time Kara

Oleska joined the call and said that our people were locked out. I said, We'll work with you

on this, but we need to put a process in place, first, we need to deal with the people who have

nowhere to stay tonight. Schaefer told us to have those people meet him at the front desk and

he would make sure they had a room for the night.

14. Prior to the above described April 26 conference call, I had been in regular contact with Jane

Jordan, my contact from the Hyatt. Jordan had told me over the preceding number of days

that, though there were protesters outside, there were barricades and it was okay.

15. On April 26, I received an email or a phone call from Muriell Carol, who worked for the

Hilton corporate office. We planned a conference call for this same day, I, Peter Davies,

Vivek Kamath, and from the Hilton, Carol, Craig Gardner, Lexi Ellingwood, Jimmy Sarfra,

Conrad (lnu). Conrad said, You gotta go, the picketers are crazy, way too much noise, too

disruptive to our other guests, things are out of control, we're getting intense pressure from

Peter Ward, do you know who that is? We said, We've heard of him. Conrad continued, We

have to get the Verizon travelers out or Peter Ward is going to shut me down. Conrad said,

Hilton employees would be joining the picket line and not coming to work at our hotels. We

said, Okay, we need some time to contact our people.

Initials: 

16. Verizon thereafter contacted those EWAs staying at the Hilton Millenium on Church Street in Manhattan.

17. On or about May 1 I spoke on the phone with Mark Igang at 1030am, manager of the JFK Airport Hilton hotel. Igang said, We can't take it anymore, we're getting complaints from flight crews who can't sleep, I'm sorry, but they're going to have to go, we're going to need them to check out of the hotel. I said, We're going to have to let your senior leaders know about this, you can't just evict us.

18. Igang and I had been in touch over the prior number of days, wherein he told me that picketers were present during the mornings from 530 to 730, but that they were managing okay. Igang had told me during these prior conversations that police had come to the sight, that Hilton security was involved, that they had barricades and were containing the crowd of approximately 100 to 150 picketers. Igang had told me that things were getting loud and he was getting complaints from guests, but he was going to see what he could do to continue managing it.

19. After my May 1st call with JFK Hilton's Igang, I had a conference call with the same people on the call as described above which took place on April 26. Either Hilton's Carol or Conrad started the call by talking about New Jersey hotels where they want to evict Verizon travelers from. Conrad said, If I don't have the Verizon people out of these hotels, Peter Ward is going to shut us down. I said, I thought this call was about JFK Hilton. They said, That's a franchise, we have no power over him. I said, I'm going to have to escalate the New Jersey situation.

20. After this call, I received a call from John Parker, from JFK Hilton. Parker called and said, You are totally disrupting our business, and I'm just confirming that you are in fact leaving. I

Initials: _____

said, Yes, we have a process that we go through and it usually takes 24 to 48 hours. That was

the end of the conversation.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 7 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

Date: __May 3, 2016__          Signature: _Debra Golmann_
                                                     Debra Golmann

**Signed and sworn to before me on** May 3, 2016 at Brooklyn, New York

DAVID J. STOLZBERG
Board Agent
National Labor Relations Board

- 7 -                                        Initials: _DG_

Communications Workers of America -
District 1 (Verizon New York Inc.,
and Empire City Subway Company
(Limited))
Case 29-CC-175331

## Confidential Witness Affidavit

**I, Peter Davies, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at       68 West Saddle River Road, Waldwick, New Jersey 07463

My cell telephone number (including area code) is   201-739-1916

I am employed by       Verizon

located at       1 Verizon Way, Basking Ridge, New Jersey

1.  I was hired by Verizon, herein the Employer, during August 2015. I currently work in the

    capacity of strategic sourcing, which generally includes purchasing on behalf of the

    Employer, including travel and accommodation purchasing.  One of my direct reports is

    Debra Goldmann, travel manager for the Employer.

2.  It is my understanding that employees of the Employer went on strike beginning April 13,

    2016 (all dates are 2016 unless otherwise noted). It is further my understanding that the

    Employer brought in approximately 1350 people from their home Verizon locations to do the

    work that was being struck. These employees were housed in various hotels throughout New

    Jersey, New York City and Long Island.

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.
The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings
or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional
information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary.  However, if
you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you
a subpoena and seek enforcement of the subpoena in federal court.



Case 29-CC-175331                                               5/3/2016

3. On or about April 24, I was on a conference call with Debra Goldman, Viju Menon, senior
   vice president for the Employer's supply chain, Jay Beasley, vice president for operations,
   and Mike Mason, head of security. The conference call was with the Marriott leadership
   including, Mark Frisone, Ashley Kingsberry, David Giblin. Giblin did the speaking on behalf
   of Marriott. Giblin said, There are escalating issues being planned for Monday at the
   Downtown Marriott.  Someone from the Employer asked, what do you mean by escalating
   activities. Giblin said, There would be picketing and other union activities at this property
   and we are concerned about the safety and security of our guests and including our Verizon
   guests. He continued, We would like to have your employees relocated from our hotel.
   Someone from Verizon said, No, we do not want our people vacated from that property, it's
   not in the best interests of our people to be moved. Giblin said he would take the information
   to his leadership and we would have another call.

4. At approximately 815pm that evening on April 24, we had another call with the same people
   as described above, with the addition of Gregg Talbot from the Marriott. Talbot did most of
   the talking. Talbot said, I had a direct conversation with Peter Ward that there would be
   escalated activities at the Downtown Marriott plus two additional hotels as the owner of the
   hotel owned all three of them. Talbot said, The Downtown Marriott was not a union hotel,
   the others were union hotels, Mr. Ward said he would create a work slowdown with the
   union employees at the two other properties unless Verizon vacated that hotel. Someone from
   Verizon said that we would get in touch with the employees at the Downtown Marriott
   location and give them the option to relocate. That was the end of the call.

5. The following morning on April 25, the same people, with the exception of Talbot, as
   described above, held another conference call. Marriott stated that CWA union employees

- 2 -


Initials: _____

were gathering across the street from the Downtown property and they were watching who was going in and out of the hotel. Marriott told us on this call that they would contact us if there was any additional activity that occurred.

6.  This same afternoon, April 25, another conference call was held with the same actors, and including Talbot from the Marriot. Talbot stated, Verizon needs to get its people out of the hotel by tomorrow. That was the end of the call.

7.  On or about April 26, I was part of a conference call with the Grand Hyatt in Grand Central Station. From the Employer, I, Debra Goldmann, Menon, and Beasley, were on the call. For the Grand Hyatt, Jimmy Salsfar and two others, the names I am not presently away of, were on the call. Salsfar said, There are between 70 and 100 picketers at my hotel that is creating a safety issue for our guests. He said, We need your people to leave the hotel. He said, I was contacted by the Hotel Union directly to get the Verizon people out of the hotel. We said that we would contact our employees and they would be out by the following day.

8.  On or about April 27, I was part of a conference call with the Hilton regarding their Millenium hotel on Canal street in Manhattan. For the Employer, I, Goldmann, Vivek Kamath, vice president of strategic sourcing, and possibly Beasly, were on the call. From the Hilton, the property general manager (male; name unknown at this time), Craig Garner, Hilton Global account manager, Conrad Wangeman, and possibly two others from Hilton were on the call. Conrad Wangeman said, Our labor relations leader was contacted directly by Peter Ward, who said that Verizon needed to vacate that hotel and if Verizon didn't vacate the union employees of the hotel would not cross the picket line which would create operational chaos for the hotel. Wangeman said, Last night there were some protesters at the hotel. I don't recall anyone from the Hilton saying on this call what, if anything, the

- 3 -                                        Initials: _____

protesters were doing at the hotel. Wangeman said, Even with the protesting at the hotel, our

other concern was the contact from Peter Ward and the impact it could have on their

operations. We said, Thank you for letting us know, we will notify our travelers that they

need to vacate the hotel. That was the end of the conference call.

9. On or about May 2 I was present on another conference call with the Hilton. The same

individuals from the Hilton were on the call. For the Employer, I, Goldmann and Kamath

were on the conference call. Wageman said, Our labor relations leader was contacted by

Peter Ward that there are three properties in New Jersey where the Verizon people need to be

vacated or there would be union activities at those properties. Wageman informed us the

three properties were the Parsipanny Hilton, the Embassy Suites in Short Hills, and the

Embassy Suites in Secaucus. Wageman said, We are concerned about the operations at these

hotels. He then asked us to vacate the hotels. Kamath said, No, we're not going to vacate the

hotels so as to set a precedent that Mr. Ward can impact our properties in New Jersey.

Wageman said that they would get back to us.

10. It is my understanding from talking with Goldmann, that she was told by the Hilton that our

employees no longer had to vacate the New Jersey properties and that they would notify her

if things changed.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 5 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

**Date:** May 3, 2016                    **Signature:** _____

                                                                    Peter Davies

Initials: _____

Signed and sworn to before me on May 3, 2016 at Brooklyn, New York

DAVID J. STOLZBERG
Board Agent
National Labor Relations Board

Initials: _____